JOSEPH E. ROBERT, SR., BROKER·ET AL. *v.*
CONSTRUCTION GENERAL, INC. ET AL.

[No. 1167, September Term, 1977.]

*Decided July 14, 1978.*

The cause was argued before GILBERT, C. J., and MOYLAN and MASON, JJ.

*Walter H. Madden,* with whom were *Madden & Murphy* on the brief, for appellants.

*David R. Kuney,* with whom was *Warren K. Kaplan* on the brief, for appellees.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Joseph E. Robert, Sr., is a licensed real estate broker in Maryland, the District of Columbia and Virginia. In 1975, he was the president of the Robert Real Estate Exchange, Inc. (REX), which was licensed in the State of Maryland. The appellee, Construction General, Inc. (CGI) is a California corporation whose main office is in Montgomery County.

In 1974, CGI negotiated a $6,800,000 construction loan with Mellon Bank, N. A. of Pittsburgh, Pennsylvania, to build a condominium project in Arlington County, Virginia, known as The Carlyle. In return, CGI executed a promissory note in the amount of $6,800,000 plus interest in favor of Mellon Bank. The note was guaranteed by Bernard Lubcher, the president of CGI, and his wife and by Jack Y. Matthews, the secretary of CGI. The note was secured by a first lien deed of trust on The Carlyle in favor of Mellon Bank.

Despite the building being 80 percent complete as of the spring of 1975, CGI had little success in selling the individual condominium units in The Carlyle. As a result, in June, 1975, Mr. Lubcher began discussing with Mr. Robert, who had been referred to him as an expert in selling distressed condominium properties, the selling of individual condominium units at The Carlyle. Facing cost overruns of approximately $1,000,000, on October 8, 1975, Mr. Lubcher on behalf of CGI entered into a written agreement with Mr.

Robert on behalf of REX whereby REX was "granted the exclusive right to sell The Carlyle for a period of one (1) year commencing September 29, 1975 and ending September 30, 1976." CGI agreed to pay REX a net commission of 3 percent of the sale price of the units, apart from any cooperating brokerage commission. REX agreed to staff The Carlyle with competent personnel six days a week, to coordinate walk-thrus, move-ins and upgrades with the developer's agent or contractor, and to aid in the marketing, promoting and merchandising of the project. The agreement provided that either party would have the right to cancel the agreement at any time during the term thereof upon 30 days written notice. During the next six weeks, REX submitted eleven contracts of sale on individual condominium units to CGI.

Meanwhile, during 1975 it had become apparent to Mellon Bank that the condominium project was facing extreme difficulties. Unknown to CGI, the bank through its assistant vice president, John G. Roch, began negotiations with Stuart A. Bernstein, one of the ultimate purchasers, to take over the project. Mellon Bank had previously financed one of Mr. Bernstein's other condominium projects. By late summer, the discussions with Mr. Bernstein and with John J. Mason, the other purchaser, revolved around making The Carlyle a rental project.

On November 17 and 18, 1975, Mr. Lubcher requested Mellon Bank to advance additional funds to cover the cost overruns. The bank, however, refused any additional funding and advised Mr. Lubcher it was considering its alternatives, including foreclosure or taking a deed in lieu of foreclosure. On Friday, November 21, Mr. Lubcher told Mr. Robert that CGI had been unable to work out negotiations for an extension of the loan or an increase in the loan and that he had been advised by his attorneys to close the building down to put a squeeze on Mellon Bank to give them additional money. Mr. Robert persuaded Mr. Lubcher, nevertheless, to keep the building open over the weekend. On Monday, November 24, however, Mr. Lubcher told Mr. Robert to turn in the key to the project, which he did.

As of November 21, there had been no approvals of credit on any of the eleven contracts and, under the agreement, REX and Mr. Robert were not as yet entitled to any commissions. At their meeting on that day, Mr. Lubcher offered Mr. Robert $6,000 in settlement for his services. Mr. Robert told Mr. Lubcher that the commissions on the contracts amounted to $16,846.50. He asked for $9,000. He testified at the trial, however, that this sum was only intended by him to cover his son's services at The Carlyle and not to settle his claim for his commissions. Mr. Robert agreed to give back the deposits to each of the eleven prospective purchasers of condominiums and get releases from them. This he subsequently did. When Mr. Lubcher several days later indicated to Mr. Robert that he would have to sign a release to obtain the $9,000 check, Mr. Robert refused to sign a release. He never received the check.

On November 22, at the request of the Mellon Bank, Mr. Bernstein and Mr. Mason toured the building. They had been to the building on a previous occasion when Mr. Robert's son was present. This was the first time Mr. Robert, however, met the two gentlemen. He showed the men the building and answered their questions. The total visit lasted approximately 30 minutes. Mr. Robert told Mr. Lubcher that the men seemed very interested in the building and asked him whether or not he was trying to work a deal with the men for the sale of the building. Mr. Lubcher told him no — that he did not even know the men.

On November 26, CGI, Mellon Bank, Mr. and Mrs. Lubcher and Jack Matthews entered into an Agreement of Sale whereby CGI agreed to convey The Carlyle to the designee or nominee of Mellon Bank. In return, Mellon Bank agreed to release CGI and the guarantors from their liability on the promissory note. Mellon Bank, on the same day, designated the Carlyle Limited Partnership as the grantee and a deed was prepared conveying the property to the Carlyle Limited Partnership. Mr. Lubcher testified that the negotiations for this transfer were all worked out between CGI and Mellon Bank on November 26.

Mellon Bank thereafter finalized its transactions with Stuart Bernstein and John Mason. On December 2, the deed conveying the property to the Carlyle Limited Partnership was recorded. On the same day, the Mellon Bank conveyed its interest in the Carlyle Limited Partnership to Mr. Bernstein and Mr. Mason by the execution of a power of attorney for service of process, a modification of deed of trust and a promissory note modification agreement.

Mr. Lubcher testified that as of November 24 he had no idea that the Mellon Bank had an assignee who was willing to buy the building. He, in fact, inquired of Mellon Bank on November 26 who the assignees were going to be. They told him they did not know — that they had several options open to them. He testified that he first learned that Mr. Bernstein and Mr. Mason were the assignees sometime in January, 1976.

Mr. Lubcher testified that he wrote to Mr. Robert on December 3, 1975, asking him to come to his office to pick up the $9,000 check and sign the release. Mr. Robert never came to the office. Mr. Lubcher also attempted to reach Mr. Robert by telephone almost daily for two weeks with no success. Mr. Lubcher finally heard from Mr. Robert through his attorney in January, 1976, when the demands which resulted in this suit were made.

On June 4, 1976, Mr. Robert sued the appellees, CGI and its officers individually — Mr. Lubcher, Charles Walsh, and Mr. Matthews, the president, vice president, and secretary, respectively — for a broker's commission on the sale of the entire project. The appellees demurred to the declaration, and the demurrer was sustained with leave to amend.

Mr. Robert then filed suit individually and on behalf of REX against the appellees in an eleven-count declaration alleging breach of contract and fraudulent concealment of the sale of The Carlyle. The court sustained the appellees' demurrer to Counts V through VIII and to Count XI without leave to amend. A demurrer to Count IX was sustained with leave to amend. An amended declaration was then filed as to Count IX only, and a demurrer to that amended count was denied.

The case proceeded to trial on Counts I, II, III, IV, IX, and X. At the close of the appellants' case the court granted a directed verdict for the defendants/appellees as to Counts III and IX which charged, respectively, fraud and deceit against REX and Robert individually. At the close of all of the evidence, a directed verdict was granted in favor of CGI on the remaining counts. The appellants appeal from the sustaining of the demurrer to Count VIII and the granting of directed verdicts as to the remaining counts.

The appellants contend first of all that the contract of October 8, 1975, gave REX the exclusive right to sell The Carlyle and that as an exclusive right to sell agreement as opposed to an exclusive listing agreement, CGI was prevented from selling the property both personally and through another broker without incurring liability for a commission to REX, regardless of whether REX was the procuring cause of the sale. The appellants contend further that the deed in lieu of foreclosure was a sale entitling REX to a commission under an exclusive right to sell agreement.

It is unnecessary to discuss whether the deed in lieu of foreclosure constituted a sale. We will assume for the sake of argument that the conveyance here was a sale, since we think the court was correct in ruling that the parties did not intend that CGI relinquish its implied right to sell the project.

12 Am.Jur.2d, *Brokers,* § 226, explains the distinction between an exclusive agency to sell and an exclusive right of sale:

> "With respect to the right of a broker to compensation on a sale negotiated by the employer without the aid of the broker, a distinction is frequently raised between an exclusive agency to sell and an exclusive right of sale. It is held that where an exclusive agency is given the broker, the owner may still sell the property without liability to the broker unless the broker has procured a purchaser able and willing to buy prior to such time. The right of the owner of the property to sell is implied in such an agency. The only effect of such

a contract is to prevent the owner from placing the property in the hands of another agent.

On the other hand, where a broker is given an exclusive right to sell property, as distinguished from an exclusive agency, he is held entitled to the agreed commission, or at least damages, when a sale is made by the owner, and it is immaterial that he was not the procuring cause thereof, provided, however, that the employment contract is supported by consideration and is not a mere unilateral offer, and provided also, according to some cases, that the broker has produced a ready, able, and willing purchaser or can show damages."

For an owner of property to relinquish his right to sell his property, the brokerage contract must provide so in unequivocal terms or by necessary implication. 12 Am.Jur.2d, *Brokers,* § 227, states:

"An absolute exclusion of an owner's right to sell his property on his own efforts, without the aid of any broker, can be effected only by a contract so providing in unequivocal terms or by necessary implication. Where any ambiguity exists, the courts favor an interpretation protecting the owner, especially where the contract was drafted by the broker himself.

In determining whether a real-estate broker's contract excludes the owner's right to sell, the use of the words 'exclusive agency' or 'exclusive sale' is not conclusive, but, as in other cases involving judicial interpretation, all the circumstances must be considered. The fact that the broker's contract of employment expressly provides that the broker has the exclusive right of sale has not in all cases been considered to negative the right of sale by the owner without liability to the broker. A contract granting a broker the 'exclusive sale' of property or appointing him the exclusive agent is not sufficient to exclude an owner's right of sale himself during the contract."

In interpreting the contract between REX and CGI, the lower court ruled, as a matter of law, that the parties did not intend that the contract cover a sale of the entire project and that, even if they did, the contract did not contemplate that CGI relinquish its implied right to sell the property:

> "[The contract] contemplated that REX was going to staff the Carlyle with personnel six days a week to sell condominiums; that they were to process the sales contracts which had to contemplate only condominiums; that they would coordinate walk-throughs, move-ins, upgrades with whomever was purchasing a condominium unit; and that they would provide their expertise to the developer and the ad agency in marketing, promoting, and merchandising of the project; and that the project referred to the condominium units and that the parties never contemplated prior to October the 8th, 1975, when they entered into this agreement that there would be a 'sale' of the entire project, the entire Carlyle in which Mr. Robert and his company would participate, much less a deed back in lieu of foreclosure.
>
> The Court also holds, as a matter of law, that even if it were contemplated that this might be a sale of the entire unit, the Court holds, as a matter of law, that in the State of Maryland, despite the fact there are no reported cases in Maryland to this effect, the Court believes the better weight of authority is to the effect that a real estate owner always has the right to sell his own property directly himself unless there is a provision in the sales contract between himself and the broker, unless there is an expressed prohibition which says that even if the owner sells the property he nonetheless must respond to the broker for a commission."

We see no reason to disturb the court's interpretation of the contract. The brokerage contract prepared by Robert and REX provides that REX would be granted the "exclusive

right to sell The Carlyle." The contract then discusses commissions in terms of a certain percentage of the sale price of the individual units and discusses the advertising and marketing of units. The contract is completely silent, furthermore, as to the owner's right to sell the property without liability for a commission. There is no specific unequivocal language which expressly negatives CGI's inherent right to sell the property nor is there language from which this could be implied. We agree that the employment of the words "exclusive right to sell" is not determinative and that even if a sale of the entire project were contemplated by the contract, these words were not here intended to relinquish CGI's implied right as an owner to sell its property. See Annotation, *Exclusive Right to Sell and Other Terms in Real Estate Broker's Contract as Excluding Owner's Right of Sale,* 88 A.L.R.2d 936. The lower court was correct in directing a verdict for CGI and against REX on Count I.

The appellants argue in the alternative that even if CGI did not relinquish its implied right to sell the property, it is, nevertheless, liable to REX for commissions because REX was the procuring cause of the sale. They rely on *Cowal v. Marletta,* 216 Md. 222, which held that even slight services of a broker, if they, in fact, are the procuring cause of the sale, are sufficient to entitle the broker to commissions. In directing a verdict for CGI on Count II and against REX, the lower court ruled specifically as to this claim:

> "The Robert Real Estate Exchange, Incorporated also says as an alternative theory on which it should collect that it was the procuring broker in this case; that it procured Mr. Bernstein and Mr. Mason as purchasers under what they consider a whole ball of wax theory; that in reality this is not a sale from the Construction General, Inc., to the Mellon Bank, but it is a sale from Construction General, Inc., to Bernstein and Mason, who are in effect the new Carlyle Limited Partnership; and that because they were the procuring brokers of Mason and Bernstein that therefore on the theory of a procuring broker they are entitled to a commission on the 7.6 million

dollars roughly that Mr. Bernstein and Mr. Mason ultimately obligated themselves to pay to the Mellon Bank, and the Court says as a matter of law that they were not the procuring agent so far as Mason and Bernstein are concerned but that it was totally an accident that occurred; namely, that Mr. Robert, Jr., happened to be on the building at the time Mr. Mason and Mr. Bernstein went to the building and that the procuring agent, if there really was one, was the Mellon Bank, but that nonetheless there was no contractual relationship between Mr. Robert and his company and the Mellon Bank so that unless the Court were to allow you to believe or to find that there was a whole ball of wax between Construction General and the Mellon Bank and that Construction General sold to Mason and Bernstein that they could not be entitled to a finder's commission on that because the Court believes that there is no credible evidence that there was any relationship whatsoever between Construction General, Inc., and Mason and Bernstein that will allow you to bridge the gap between the sale, if there is one, between Construction General, Inc., and Mellon Bank and then Mellon Bank to Mason and Bernstein."

We find *Cowal* to be completely inapposite and agree with the ruling of the court that there was a complete dearth of evidence from which the jury could find that the appellants were the procuring cause of the sale. Mr. Bernstein testified that it was Mellon Bank's assistant vice president, John Roch, who first discussed The Carlyle with his partner and him in the spring of 1975. The Mellon Bank was financing another of Mr. Bernstein's and Mr. Mason's projects. That summer, Mr. Roch asked Mr. Bernstein and Mr. Mason whether they would be interested in taking over The Carlyle. They told him they would be interested. It was only when they went to look at the building that they met Mr. Robert and his son. Mr. Bernstein testified that they settled on the property in the latter part of 1975 and that prior to that time they had no negotiations whatsoever with Mr. Lubcher, Mr. Walsh, Mr.

Matthews, or anyone else from CGI. Viewing the evidence in the light most favorable to REX, there was no evidence that Mr. Robert or REX had any effect whatsoever on the negotiations between Mellon Bank and Mr. Bernstein and Mr. Mason or on the ultimate transfer of The Carlyle from CGI to Mellon Bank by deed in lieu of foreclosure and then to the Carlyle Limited Partnership. See *Hampton Park Corporation v. T.D. Burgess Company, Inc.,* 270 Md. 269.

The appellants' fourth contention is that the court incorrectly sustained CGI's demurrer to Count VIII of their declaration. The appellants claim that Count VIII is virtually the same as Count II except that the claim for a broker's commission based on the procuring cause of the sale is made by Joseph E. Robert, Sr., individually while in Count II the claim is made on behalf of REX. Appellants acknowledge that "while there may be but one recovery under the procuring cause theory, this does nothing to change the fact that both Counts II and VIII of the amended declaration were well pled." The contention, however, is moot. In directing a verdict for CGI, the lower court properly found that neither Mr. Robert nor REX was the procuring cause of the sale.

At the close of the plaintiffs-appellants' case, the court directed a verdict for CGI and its officers on Counts III and IX, which charged fraud and deceit against REX and against Robert individually. The gist of the counts was that Mr. Lubcher, on behalf of CGI, falsely represented to Robert and REX that the appellees were being forced to turn the building back to Mellon Bank and that the contracts procured by the appellants would, therefore, have to be cancelled and the efforts to sell additional units terminated. The appellants alleged that these representations were deliberately calculated to conceal the "sale" of the building and prevent the appellants from claiming their just commissions. They alleged that these representations were false, because the appellees were conveying the property back to Mellon Bank for good and valuable consideration including an unconditional release of CGI and the individual guarantors. The appellants further alleged that the appellees Matthews and Walsh cooperated and actively participated in the fraud

by not advising the appellants of the falsity of the representations.

The appellants' claims of fraud were completely unsupported by the evidence. Even without considering the other essential elements of an action for fraud and deceit (see *James v. Weisheit*, 279 Md. 41), there was a complete lack of evidence of a false representation of a material fact by the appellees or of a fraudulent concealment. On the contrary, Mr. Robert was fully advised as to all material facts. He knew the situation with The Carlyle at the time the brokerage agreement was executed. He knew the project was in financial distress. He knew that Mr. and Mrs. Lubcher and Mr. Matthews were the individual guarantors. That Mr. Lubcher's optimistic assurance to Mr. Robert in June, 1975, that The Carlyle would not be foreclosed upon proved incorrect did not amount to a false representation.

From September to November, 1975, Mr. Robert was at all times advised of The Carlyle's worsening financial situation. He knew that CGI was facing cost overruns on the project, that it needed additional funds to complete the project, and that Mellon Bank refused to grant additional funding or extend the mortgage, as a result of which The Carlyle was forced to close. CGI was in default of its mortgage and when it ultimately conveyed the property to Mellon Bank, it was by deed in lieu of foreclosure. There was not a scintilla of evidence that CGI and Mellon Bank arranged a "sale" of The Carlyle to Bernstein and Mason. The evidence, on the contrary, later disclosed that the negotiations between CGI and Mellon Bank and those between Mellon Bank and Bernstein and Mason were distinct and separate.

Apart from seeking recovery on the express contract, REX also sought to recover under the common counts (Count IV) for its services on a quantum meruit basis. There is no question that the appellants were prevented from earning their commissions on the sale of the eleven condominium units, 50 percent of which was payable upon issuance of a credit commitment and the balance upon settlement, by the default of CGI on its mortgage to Mellon Bank and by the subsequent deed in lieu of foreclosure which was executed.

Contrary to the lower court's ruling, we, likewise, feel that Robert's efforts in obtaining releases from the eleven prospective purchasers did not relinquish any claim for his services. Robert testified that although CGI had not yet signed any of the contracts, he obtained the releases to protect his license. Whatever meritorious claim, however, the appellants might have against CGI for its inability to consummate the transactions involving the eleven contracts of sale is defeated by the fact that REX was not a licensed broker in the State of Virginia. Having examined the applicable law, we feel that the appellees' argument in this regard is well taken.

Regarding real estate brokerage contracts, the general rule is that the validity and enforceability of the contract is governed by the law of the state where the contract was made, that is, the state where the last act necessary to make it a binding agreement took place. As to the distinction between a unilateral and a bilateral contract, see 2 Beale, *Treatise on the Conflict of Laws,* § 323.2, "Informal Contract to Compensate or Reimburse Agent." Where, however, a brokerage contract is made in one state but its performance is clearly contemplated in another state, the law of the place of performance governs the validity of the contract. If the contract is invalid under that state's laws, for example for failure of the broker to obtain the required license, it will be unenforceable in the state where the contract was made even though no law of that state was violated. Annotation, *Conflict of Laws as Regards Brokerage Contracts,* 159 A.L.R. 266; 12 C.J.S., *Brokers,* §§ 24 and 67.

The contract here was executed in Maryland. REX was duly licensed as a real estate broker in Maryland. The contract, however, provided for the sale of condominium units at The Carlyle in Arlington, Virginia. It provided that REX would staff The Carlyle with competent personnel six days a week, that it would coordinate walk-thrus, move-ins, upgrades, etc. with the developer's agent or contractor, that it would aid in the marketing, promoting and merchandising of the project, and that it could deal in the sale of carpet for installation in the units. The nature of the contract, we feel, was such that

Virginia was clearly contemplated as the place of performance. As such, REX would have to comply with any licensing requirement of Virginia to entitle it to any commissions.

Va. Code, § 54-749 (1974) provides:

> "It shall be unlawful for any person, partnership, association or corporation, to act as a real estate broker, real estate salesman, or rental location agent or to advertise or assume to act as such real estate broker, real estate salesman, or rental location agent without a license issued by the Virginia Real Estate Commission. No partnership, association or corporation shall be granted a license, unless every member or officer of such partnership, association or corporation, who actively participates in its brokerage business, shall hold a license as a real estate broker, and unless every employee who acts as a salesman for such partnership, association or corporation shall hold a license as a real estate salesman; provided, however, that a person who holds a license as a real estate broker may act as a salesman for another real estate broker."

The Virginia Supreme Court of Appeals has interpreted this statute as a police regulation for the protection of the public. Contracts made in violation of it therefore are illegal and void. *Massie v. Dudley,* 3 S.E.2d 176 (Va. 1939).

REX was not licensed in Virginia. Mr. Robert, however, was licensed in that state. The Supreme Court of Appeals of Virginia, nevertheless, has made it clear that the license of an officer of the corporation does not confer on the corporation the right to engage in business. *Hancock Co. v. Stephens,* 14 S.E.2d 332 (Va. 1941). To like effect, Virginia Real Estate Commission, Rules and Regulations (Nov. 2, 1974) POR 9-107, provides in pertinent part:

> "Every partnership, association or corporation must secure a separate and distinct real estate broker license before transacting business as a real estate broker. This license is separate and distinct from the

92

individual broker license required of each partner, each associate, and each officer of the corporation who is active in the brokerage business."

Since REX, therefore, would be barred from recovering on the express contract here because it was illegal and void, it also is barred from recovering on any quantum meruit basis. *Massie v. Dudley, supra.*

Robert is also barred from recovering individually based on the cooperating brokerage commission specified in the contract. *State Realty Co. v. Wood,* 57 S.E.2d 102 (Va. 1950).

*Judgment affirmed; costs to be paid by appellants.*