ATLANTIC RICHFIELD COMPANY *v.* CORNELIUS F. SYBERT, JR. ET AL.

[No. 718, September Term, 1981.]

*Decided March 2, 1982.*

The cause was argued before MASON and LISS, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*John F. Wilson, III,* with whom was *Charles M. Preston* on the brief, for appellant.

*Thomas A. Garland* for appellees.

LISS, J., delivered the opinion of the Court.

This appeal arises out of a declaration filed by Sybert, Sybert and Nippard, the appellees herein, all of whom are attorneys at law duly qualified to practice their profession in the State of Maryland, against the appellant, Atlantic Richfield Company (hereinafter Arco), a Pennsylvania corporation duly qualified to do business in the State of Maryland. The suit, filed in the Circuit Court for Howard County, alleged a claim for real estate commissions arising out of the negotiation of a contract of sale between Arco and Belvoir Terminals Corporation, a wholly owned subsidiary of the Citadel Corporation, a client of Mr. Nippard. The transaction involved the sale of certain real estate and facilities owned by Arco in Virginia to Citadel's subsidiary corporation at a price in excess of three million dollars and a claim for real estate commissions in the amount of $312,500. By appropriate motion on behalf of the appellant the case was removed from Howard County to the Circuit Court for Carroll County and was tried, without the intervention of a jury, before Judge Donald J. Gilmore. At the conclusion of the case Judge Gilmore awarded a judgment in favor of the appellees in the amount of $312,500 and it is from this judgment that this appeal was seasonably filed.

The facts in this case are in some particulars undisputed and in others, hotly contested. In order to understand the complex legal issues in dispute between the parties it is necessary to state the facts rather fully. In 1972 Arco had an option to purchase certain real estate situated in Howard County, Maryland (hereinafter the "Schultz property") on which it planned to install certain storage facilities in connection with a pipeline terminal to be constructed on the property. Arco's plans to exercise its option were subject to its ability to secure a special exception and variance from the Howard County Board of Appeals which would substantially increase the permissible storage capacity of the terminal to be constructed on the property.

Cornelius F. Sybert, Jr. was employed by Arco to secure the necessary variance and special exception from the Howard County Board of Appeals. Sybert, with the assis-

tance of George Tracy, an employee of Arco, presented Arco's case to the Board of Appeals which denied the variance and special exception. An appeal was thereupon taken to the Circuit Court for Howard County by certain of the protestants, who appeared in the proceedings before the Board. The action of the Board was revised. A further appeal was then noted to this Court and was still pending at the time of the initiation of the instant proceedings.

Mr. Tracy and Mr. Leonard Berkowitz, another employee of Arco, had maintained liaison throughout the proceedings involving the "Schultz property" with Mr. Sybert. Before a final disposition of the appeal to this Court, Tracy advised Sybert that Arco was uncertain whether it would actually develop the "Schultz property" even if it received final approval for the variance and special exception.

Mr. Nippard, in the interim, had been contacted by Roger Koehneke, a vice president of Citadel Corporation, for the purpose of securing a parcel of land in Howard County suitably zoned for tank farm use. Nippard was to represent Citadel in securing the necessary approvals for the establishment of storage facilities to be operated in conjunction with a pipeline terminal. Nippard engaged the services of Ellsworth Iager, a local real estate dealer, to locate an appropriate site. Iager did in fact locate a suitable piece of real estate owned by Contee Sand and Gravel Company, situated on the same pipeline which traversed the "Schultz property" on which Arco had an option and tentative zoning approval.

Because Arco had indicated its uncertainty as to the future of the "Schultz property", Sybert and Nippard arranged for a meeting between Tracy and Koehneke to discuss their mutual interests. Before the meeting between Tracy and Koehneke began, Sybert and Nippard met privately with Tracy to discuss the question of compensation to be paid to Sybert and Nippard in the event the meeting between Tracy and Koehneke resulted in the sale of the "Schultz property" by Arco to Citadel. In the course of that meeting Tracy advised Sybert and Nippard that in the event Arco was unwilling to sell the "Schultz property" to Citadel,

Arco owned and was offering for sale two other properties which might be suitable for Citadel's needs, *i.e.,* properties located on Key Highway in Baltimore City and Fort Belvoir, Virginia. Tracy discussed with Sybert and Nippard several alternative possibilities involving these properties such as the possibility of a lease or joint venture but it was finally agreed upon, according to Sybert and Nippard, that in the event of a sale of any of the properties that Arco would pay the "usual" or "customary" commission. Tracy's recollection of the discussion with Sybert and Nippard was that he did attend a meeting at appellees' offices sometime in October of 1974 to discuss the "Schultz property" and that at that meeting he mentioned that appellant's Belvoir Terminal and Key Highway Terminal in Baltimore might be available for sale in the near future. Tracy explained that the "Schultz property," Belvoir Terminal and Key Highway Terminal were interrelated for appellant's total distribution picture and the ultimate outcome of the "Schultz property" would have a bearing on the availability of either or both the other properties. Tracy admitted meeting privately with Sybert and Nippard before meeting the Citadel representative but stated that commissions were not discussed as a form of compensation for the appellees. He testified he never agreed to pay brokerage commissions for any possible sale of Belvoir Terminal and that he did not have any authority involving any aspect of the sale of Belvoir Terminal or any other surplus real estate owned by appellant.

George Tracy's title in Arco's corporate structure was "Real Estate Manager, Special Projects" and he was required to report directly to one of Arco's vice presidents who was designated as "Manager of the Distribution Department." Arco's corporate procedure to place property owned by it on the market for disposition was to transfer the transaction to another individual in the "Manager of Distribution" department named Richard Erdlitz. Some time after Tracy's meeting with Koehneke (as arranged by Sybert and Nippard), Mr. Tracy wrote a letter to Sybert, with a copy to Mr. Erdlitz, in which he stated that the "Schultz property" had an uncertain future with Arco. The letter further stated:

> As I did advise you and Mr. Koehneke, our marine terminal at Key Highway and Lawrence St., Baltimore, Md., and the pipeline terminal at Belvoir, Virginia will both be put on the market shortly. If Citadel is interested in either of these facilities as an alternate to building their own, I suggest you contact Mr. Richard Erdlitz, Manager of our Commercial Properties Department, 1500 Market Street, Philadelphia, Penna., 19101- phone (215) 557-3270, for further information.

Sybert communicated the information in this letter to Nippard, who, on November 19, 1974, called Mr. Erdlitz in Philadelphia and advised him of his prior conversations with Tracy and that Citadel Corporation was interested in the Belvoir property. Erdlitz advised Nippard that a brochure on that property was being prepared and as soon as the brochure was ready it would be sent to Nippard. Shortly thereafter Nippard received from Erdlitz a brochure entitled "Pipeline Terminal for Sale," which Nippard forwarded to Koehneke of Citadel by letter dated January 24, 1975. Citadel's counsel, Alan D. Keiler, then called Erdlitz and after negotiations between Erdlitz and Keiler the parties executed a contract of sale for the Belvoir property for 3.125 million dollars.

Sybert became aware that the parties were proceeding to settlement and called Erdlitz to remind him of his claim for commissions. Erdlitz promptly denied any commissions were due. The suit for commissions then was filed and the trial judge made the following findings of fact and law:

(a) Mr. Tracy, "Real Estate Manager Special Projects" was clothed with at least apparent authority to enter into the Agreement testified to by Messrs. Sybert and Nippard.

(b) A valid and enforceable contract was agreed to by the parties in this action.

(c) In accordance with the testimony of Mr. Iager the rate of compensation agreed upon

by the parties was ten percent (10%) of the purchase price.

(d) The sale of the Belvoir property by Arco to Belvoir Terminals Corporation satisfied the condition of the Contract and entitled the Appellees to the compensation agreed upon.

Appellant raises six issues to be determined by this appeal:

I. Did the trial court err in finding the existence of a brokerage agreement between appellees, attorneys, and appellant, their client?

A. Did appellees meet their burden of proving their cause of action by clear and convincing evidence, or even by a preponderance of the evidence?

B. Did the trial court err in finding that George Tracy, an employee of appellant, had apparent authority to bind appellant to the alleged brokerage agreement?

II. Was the alleged brokerage agreement null and void because appellees failed to fully disclose to appellant, or even to George Tracy, the potential pitfalls of their dual representation of appellant and Citadel Corporation and also failed to obtain any informed consent?

III. Did appellees meet their burden of proving that they were the procuring cause of the sale of appellant's Belvoir Terminal?

IV. Was the applicable choice of law in this case either the law of Virginia or the law of the District of Columbia, rather than the law of Maryland?

V. Could appellees recover a brokerage commission under Maryland law when appellees were not licensed real estate brokers?

VI.  Did appellees meet their burden of proving that there was a customary and usual brokerage commission and that any such commission was certain, uniform and notorious?

## I. A., I. B., II and V.

Appellant initially contends that the appellees failed to overcome their burden of proving their case by clear, satisfactory and convincing evidence. This standard, if applicable, is more onerous than the usual standard of proof imposed upon a plaintiff, *i.e.,* the burden of proof by a preponderance of the evidence.[1] In support of this contention appellant cites the following cases: *Iula v. Grampa,* 257 Md. 370, 263 A.2d 548 (1970); *Cook v. Hollyday,* 185 Md. 656, 45 A.2d 761 (1946); *In re Williams,* 180 Md. 689, 23 A.2d 7 (1941); *Baker v. Otto,* 180 Md. 53, 22 A.2d 924 (1941); *Crest Investment Trust, Inc. v. Comstock,* 23 Md. App. 280, 327 A.2d 891 (1974). After reviewing these cases, however, we find that they are factually inapposite with the case at bar. In each of these cases the attorney-client relationship was attacked on the basis that there had been fraudulent conduct or undue influence on the part of the attorney. Under these circumstances the Court of Appeals and this Court has held that the transactions were at least *prima facie* invalid and that the burden was on the attorney to establish by the clearest and most satisfactory evidence that the transaction was fully understood and fair in all respects. In the case at bar, there is not the slightest suggestion of fraud or undue influence by the appellees. We conclude the burden of proof on the plaintiffs in this case is that usually imposed on a plaintiff — to prove his case by a preponderance of the evidence.

---

1. Appellant argues that if we impose the clear and convincing standard upon appellees in this case we are imposing nothing more than the criminal law standard of "proof beyond a reasonable doubt" clothed in civil garb. *See* Williams v. Superintendent, Clifton T. Perkins Hospital Center, 43 Md. App. 588, 406 A.2d 1302 (1979), *vacated* Coard v. State, 288 Md. 523, 419 A.2d 383 (1980).

Appellees were required to prove by a preponderance of the evidence that a brokerage agreement was entered into between appellees and appellants on the basis: (1) of the alleged agreement between Tracy and the appellees; (2) that Tracy had actual or apparent authority to enter into such an agreement on behalf of the appellant; (3) that appellees were the procuring cause of the sale; (4) that there was a customary and usual brokerage commission in Maryland in 1974 and 1975 for the sale of improved industrial property; and (5) that said customary and usual commissions were certain, uniform and notorious.

As to the first and third of these issues it is clear from the record that Sybert and Nippard both testified expressly that Tracy agreed that the appellant would pay the customary and usual brokerage commissions if Nippard's client was successful in buying the excess property appellant had for sale. Furthermore, there was evidence that prior to the meeting on October 16, 1974 (between Sybert, Nippard and Tracy) neither Tracy, Erdlitz (Tracy's superior) nor any other Arco official had heard of the Citadel Corporation. Tracy's letter to Sybert with a copy to Erdlitz (which we have previously quoted), clearly indicated that Sybert and Nippard were representing Citadel and that Citadel was interested in the Key Highway and Fort Belvoir properties. When Nippard called Erdlitz, he advised Erdlitz of his prior conversation with Tracy and the current interest of Citadel in the Belvoir property. Erdlitz promised Nippard that as soon as it was ready he would send a brochure to Nippard giving all the details of the Belvoir offer. As a follow-up to Nippard's phone call, Erdlitz sent a handwritten memorandum to his assistant, Grady B. Law, identifying "Sybert, Sybert, etc." as a prospect for the Belvoir pipe terminal property. Nippard did in fact receive the brochure and forwarded it to Koehneke of the Citadel Corporation. It was in reaction to Nippard's action that Alan D. Keiler, counsel for Citadel, communicated with Erdlitz and began negotiations for the purchase of the Belvoir property. This resulted in a contract of sale with Belvoir Terminals, a newly created alter ego of Citadel, for the full asking price of $3,125,000.

Moreover, it is conceded by the appellant that prior to the October 16, 1974 conference in Sybert's office, Arco had no knowledge of Citadel and Citadel's interest in the Belvoir property resulted from the meeting. Arco's basis for the final refusal to pay commissions to Sybert and Nippard was expressed in Arco's letter to Sybert wherein it was stated, "you are not a real estate broker and were never employed by this company to act as a real estate broker in any transaction."

From this language it is clear to us that Arco was relying on the provisions of Maryland Code (1957, 1979 Repl. Vol., 1981 Cum. Supp.) Article 56, § 212 (which defines the business of a real estate broker) and § 217 (which proscribes carrying on such business unless licensed to do so). The appellees make no contention that they were licensed real estate brokers. Appellant, however, has entirely overlooked the effect of Article 56, § 212 (f) (6), which states:

(f) *Exceptions.* —

The terms "real estate broker" and "real estate salesman" do not include:

(6) Attorneys at law who are not regularly engaged in the real estate business and who do not hold themselves out by sign, advertisement or otherwise as offering to the general public the services authorized by this subtitle to be performed by real estate brokers.

It is clear from the record that there was sufficient evidence from which the trial court could find either an express or implied contract between the parties regarding the appellee's right to be paid commissions for their services in securing a purchaser for the Belvoir property. Therefore, the fact that none of the attorneys were licensed real estate brokers would not operate so as to deny them the right to their compensation since they clearly fell within the exception expressed in Section 212 (f) (6) of Article 56.

The trial court in its findings of fact concluded that Tracy was clothed with at least apparent authority to enter into

the agreement as contended by Sybert and Nippard. We define "apparent authority" in *Miller v. Mueller,* 28 Md. App. 141, 343 A.2d 922 (1975), as follows:

> Apparent authority may arise when the actions of the principal, reasonably interpreted, cause a third person to believe in good faith that the principal consents to the acts of the agent. Apparent authority also may arise when the principal knowingly permits the agent to act in a certain manner as if he were authorized. The action or manifestation of authority giving rise to the reliance must be that of the principal, and the reliance by the third person on the action or manifestation of authority must be reasonable. [Citations omitted]. [28 Md. App. at 148].

*See also Fuller v. Horvath,* 42 Md. App. 671, 402 A.2d 134 (1979), wherein we held that the powers of corporate agents and the scope of their authority depend on the same principles as in the case of agents for individuals.

In order to establish that Tracy was clothed with at least apparent authority to enter the subject agreement, the appellees were required to prove that the actions of appellant, when reasonably interpreted by the appellees gave rise to apparent authority and that appellees' reliance on such actions was reasonable. The trial court had before it evidence that Tracy's official job title with Arco was "Real Estate Manager, Special Projects"; that in February, 1974 he was assigned to act as coordinator for the "Schultz property"; that from February, 1974 until his retirement in December, 1974, Tracy was the appellant's primary contact with the appellee concerning the "Schultz property"; that he was the representative of Arco when the conference was arranged between Sybert, Nippard, Citadel and himself acting on behalf of Arco; that he attended the pre-conference between Sybert, Nippard and himself at which he admits the question of "compensation" for Sybert and Nippard was discussed in the event a deal with Citadel was arranged, but contends no brokerage commissions were mentioned; and that he

advised Erdlitz by letter that as a result of the conference between the appellees, Citadel, and himself there was some interest on the part of Citadel in the purchase of the Belvoir property. Upon a full consideration of the testimony in the record extracts and the exhibits offered in support of the testimony, we do not find that the trial judge, having the benefit of the appearance of the witnesses before him, erred in concluding that Tracy was clothed with at least apparent authority to enter into the agreement testified to by Messrs. Sybert and Nippard.

Appellant contends that the alleged brokerage agreement was null and void because the appellees failed to fully disclose to Tracy or to the appellant the potential pitfalls of their dual representation of appellant and Citadel Corporation and that appellees failed to obtain any informed consent to such dual representation. Appellant relies principally upon *Crest Investment Trust v. Comstock, supra,* and Canon 5 of the Code of Professional Responsibility and Disciplinary Rule 5-105, found in Maryland Code (1957, 1977 Repl. Vol.) "Maryland Rules" Vol. 9B, Appendix F.

In *Crest,* we said:

This is rather a situation where an attorney has chosen to act for both sides (with the knowledge of both sides) in a business transaction — an undertaking which is indeed fraught with serious problems and potentially dire consequences and should generally be avoided.

In the first place, counsel incurs substantial risk of violation of Canon 5 of the Code of Professional Responsibility and the Disciplinary Rule based on this Canon, DR 5-105. The Canon declares that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client," and DR 5-105 states that in situations where the exercise of a lawyer's independent professional judgment on behalf of a client is likely to be adversely affected by his representation of another client, the lawyer may represent both clients only "if it is obvious that he

can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each. [Footnotes omitted]. [23 Md. App. at 300-01].

The Court further stated:

Furthermore, if dual representation does occur, fidelity to the Code of Professional Responsibility and prudent concern for legitimate self-interest against possible liability dictate that full disclosure be made of the possible dangers involved and that the legal representation be fundamentally fair to both sides. The requirements of full disclosure were spelled out in *In re Kamp,* [40 N.J. 588,] 194 A.2d p. 240 [(1963)], in terms not inappropriate to the instant case:

"Full disclosure requires the attorney not only to inform the prospective client of the attorney's relationship to the seller, *but also to explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer have independent counsel. The full significance of the representation of conflicting interests should be disclosed to the client so that he may make an intelligent decision before giving his consent.* If the attorney cannot properly represent the buyer in all aspects of the transaction because of his relationship to the seller, full disclosure requires that he inform the buyer of the limited scope of his intended representation of the buyer's interests and point out the advantages of the buyer's retaining independent counsel." [Emphasis in original]. [23 Md. App. at 303].

*See also Sinclair v. State,* 278 Md. 243, 363 A.2d 468 (1976). Our careful consideration of *Crest,* however, convinces us that it is factually inapposite to the facts in this case.

In *Crest,* we found disclosure by an attorney involved in dual representation to have inadequately advised one of his clients upon the following factual situation, as quoted from the trial court's opinion:

It is patently clear that the defendant Kaplan, acting as attorney for the plaintiffs in this transaction, failed to make an adequate disclosure to them of all relevant factors involved in their entering into the agreement of November 30, 1967, with defendant Crest for which he was also acting as attorney, and said agreement was obviously preferential to his clients, defendants Crest and Comstock, Inc., and manifestly unfair to his clients, the plaintiffs. Defendant Kaplan failed to disclose to plaintiffs that Crest, having guaranteed the mortgage on their farm, might have to pay that mortgage, and that their home and the ninety-seven (97) acres of their farm optioned to Crest's subsidiary might not be obligated for the debts of Comstock, Inc. There was no disclosure measuring the value of the acres against the value of what Crest had invested or explaining how the Comstocks would receive a decreased rather than an increased interest in potential profits for having contributed their farm to the Crest subsidiary. Furthermore, the later conveyance to Crest is nowhere explained by the evidence, although made at a time when defendant Kaplan was acting as attorney for the Comstocks. Any lawyer should have known that this was not a fair transaction and the failure to protect the plaintiffs and so advise them while acting as their attorney is a complete breach of the fiduciary relationship. The court views defendant Kaplan's actions as an obvious attempt to protect his client Crest from further losses occasioned by the poor investment he had recommended to its Board of Directors by taking advantage of the plaintiffs. [*Id.,* at 299-300]. [Emphasis omitted].

There is no such situation in the case at bar. Counsel made full and complete disclosure of their situation from the very beginning and there is not the slightest suggestion of a lack of good faith on behalf of appellees. We find no failure by appellees in complying with either the letter or the spirit of Canon 5.

### III.

Both appellant and appellees rely principally on *Hampton Park Corporation v. T. D. Burgess Co., Inc.,* 270 Md. 269, 311 A.2d 35 (1973), as authority to sustain their respective positions on the issue whether the trial judge was clearly erroneous in his conclusion that the appellees had met their burden of proof in establishing that the appellees were the procuring cause of the sale of the Belvoir property.

The substantive law is found in *Hampton, supra,* at pp. 280, 281, where the Court of Appeals said:

> Long ago, in *Keener v. Harrod,* 2 Md. 63 (1852), our predecessors declared:
>
> ". . . We understand the rule to be this, (in the absence of proof of usage), that the mere fact of the agent having introduced the purchaser to the seller, or disclosed names by which they came together, to treat, will not entitle him to compensation; but, if it appears that such introduction or disclosure was *the foundation on which the negotiation was begun and conducted, and the sale made,* the parties cannot afterwards, by agreement between themselves, withdraw the matter from the agent's hands, so as to deprive him of his commission. (citations omitted) . . . ." 2 Md. at 71 (emphasis added).
>
> That rule was reaffirmed in *Jones v. Adler,* 34 Md. 440, 443 (1871), and has since been consistently followed in a line of cases too numerous to list here. We also held in *Cowal v. Marletta,* 216 Md. 222, 139 A.2d 712 (1958) that:

"The question of whether a broker's efforts are the procuring cause of a sale is not to be determined by whether his services are slight or extensive but rather on the basis of whether the efforts he did make were in fact the *proximate cause of interesting the purchaser, and his ultimate agreement to buy. . . ."* 216 Md. at 228 (emphasis added).

In *Bearman v. Roland Park Co.,* 218 Md. 515, 147 A.2d 697 (1959), we went on to say:

". . . One satisfies the legal test as a procurer of the purchaser if the testimony permits the inference that *the sale was accomplished as a result of his action* in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations. (citations omitted)." [Emphasis in original]. [270 Md. at 280-81].

Applying these legal principles to the facts of the instant case, we do not find that the trial judge was clearly erroneous in concluding that the appellees were the procuring cause in the sale of the Belvoir property. *See* Maryland Rule 1086. Buttressing our conclusion is the fact that appellants' house counsel, Mr. Berkowitz, is alleged to have admitted this in his conversations with Mr. Sybert and never denied it in his testimony below, as evidenced by the record extract. Furthermore, the denial of the appellee's claim by Mr. Eisenberg is based entirely on appellee's contention that the appellees were never employed as "a real estate broker." We attach no significance to the fact that the nominal purchaser was an alter ego of Citadel rather than Citadel itself.

## IV.

Appellant next raises the issue whether the applicable choice of law in this case was either the law of Virginia or the law of the District of Columbia rather than the law of

Maryland. When confronting a conflict of laws issue in an action *ex contractu,* the Maryland Courts have consistently applied the law of the jurisdiction where the last act culminating in the contractual relationship was performed. *See Snider Bros., Inc. v. Heft,* 271 Md. 409, 317 A.2d 848 (1974). *See also Robert v. Construction General, Inc.,* 40 Md. App. 78, 388 A.2d 168 (1978), where the Court stated:

> Regarding real estate brokerage contracts, the general rule is that the validity and enforceability of the contract is governed by the law of the state where the contract was made, that is, the state where the last act necessary to make it a binding agreement took place. [40 Md. App. at 90].

Appellant cites *Robert* as supporting its position because that Court noted and applied an exception to the general rule when it held that when the performance of a brokerage contract is clearly contemplated in another state, the law of the place of performance will govern. A close examination of the facts in *Robert,* however, indicates that the exception was mandated by the peculiar facts of the agreement in that case. In *Robert,* the provisions of the brokerage contract required the Maryland broker to staff a Virginia condominium project with personnel six days a week, to coordinate walk-throughs and move-ins, and to aid in marketing, promoting and merchandising of the project. Under these circumstances we held Virginia law was applicable.

No such facts apply in this case. The testimony of Sybert and Nippard, if believed, showed that all the elements of the brokerage agreement between the appellant and the appellees took place in Ellicott City, Maryland; that by the terms of the agreement the appellees were to acquaint the appellant with a purchaser ready, willing and able to buy; and that the introduction of the appellant and the buyer's agent took place through the efforts of the appellees in Maryland. Under these circumstances, we find no error in the trial judge's conclusion that the contract was made in

Maryland, and to be performed in Maryland. *See* Maryland Rule 1086.

## VI.

Appellant finally contends that the appellees failed to meet their burden of proving that there was a customary and usual brokerage commission and that such a commission was certain, uniform and notorious. The trial court had before it the testimony of Nippard and Sybert that the agreement between them and Tracy was based upon a promise to pay the usual and customary commissions. Sybert, a lawyer with over twenty-five years of real estate experience, a member of the Board of Directors of a local bank, and counsel to the local Board of Realtors, testified that the usual commissions in the sale of industrial real estate was 10%. Nippard, also experienced in real estate transactions and counsel for the largest developer in the area, testified to the same effect. The appellees produced as an expert in the field one C. Ellsworth Iager, who established his long experience as a real estate dealer in Howard County and the Washington Metropolitan Area. He testified concerning his employment as an expert by the State Highway Administration, his testimony as an expert in various courts of the State of Maryland, and his employment as an expert by a number of financial institutions and law firms in the area involved in similar controversies. Specifically, Mr. Iager stated that he had an agreement with Contee Sand and Gravel Co. for the payment of a 10% commission in negotiating a contract for the sale of an appropriate site for the establishment of a tank farm in the general area of the "Schultz property." Iager stated that based on his experience of over twenty-five years, the payment of a 10% commission computed on the sales price was appropriate in a transaction of the kind here involved and that if a smaller commission was to be paid it would be subject to negotiation usually initiated by the seller. The trial court found that for the relevant period here involved, the usual brokerage commission for the sale of industrial property in the Baltimore-Washington corridor,

including Virginia, was 10% of the purchase price, as testified to by Iager.

The appellant offered its own expert, Robert M. Arnold, who denied there was such a thing as custom or usage in the real estate profession. He sought to have the trial judge accept his statement that brokers did not discuss the rate of commissions with each other and that each transaction is governed by negotiation between the parties. He undoubtedly qualified as an expert in the real estate business but the ultimate decision in this case was a matter for the trier of the facts to determine which expert was to be believed. In *Eastern Associates, Inc. v. Sarubin,* 274 Md. 378, 336 A.2d 765 (1975), the Court of Appeals stated that a broker seeking to recover on the basis of custom must prove the customary commission was certain, uniform, and notorious.

The trial judge had before him sufficient evidence to permit him to conclude that there was in fact a customary commission on the sale of industrial property in the area here involved and that the sophisticated, knowledgeable owners of the property had sufficient knowledge of the facts which pertained at the time of the agreement so as to charge them with knowledge of the custom. Tracy's specific agreement as testified to by Sybert and Nippard that Arco would pay a usual commission in the event of a sale, was evidence that as Arco's representative he was fully aware of the customary arrangements with respect to brokerage commissions. The trial judge had the benefit of seeing the witnesses and of hearing their testimony and we cannot find on the basis of the record that he was clearly erroneous. Maryland Rule 1086.

*Judgment affirmed, costs to be paid by appellant.*