**ALAMRIA**

v.

**TELCOR INTERNATIONAL, INC., et al.**

Civil Action No. CCB–95–1551.

United States District Court,
D. Maryland.

April 3, 1996.

Samuel Rosenthal, Washington, DC, for Plaintiff.

Jeffrey M. Schwaber, Rockville, MD, for Defendants.

## MEMORANDUM OPINION

BLAKE, District Judge.

On August 11, 1995, the plaintiff, Alamria, filed a six count complaint against corporate defendants Telcor International ("Telcor"), Operator Communications, d/b/a/ Oncor Communications ("Oncor"), and individual defendants Ronald J. Haan, and Joseph F. Switzer. The complaint alleges a variety of claims sounding in breach of contract and commercial torts.

At the center of this case is a contract containing a broad arbitration clause. The contract is signed by representatives of Alamria and Telcor. However, Alamria also seeks to hold Oncor liable on the contract under two theories. First, Alamria contends that Oncor and Telcor had a principal/agent relationship for the ultimate benefit of Haan. Second, Alamria urges this court to pierce Telcor's corporate veil in order to hold Oncor liable for Telcor's alleged breach of the contract. Oncor insists that it should not be required to defend this lawsuit because of the absence of contractual privity with the plaintiff and because it is a separate and distinct entity from Telcor.

This matter is before the court on Telcor's and Oncor's motions to dismiss the complaint, Oncor's motion for a protective order, and Alamria's motion for summary judgment and provisional relief. For the reasons set forth below, Telcor's motion to dismiss will be deemed a motion to compel arbitration and will be granted, Oncor's motion to dismiss will be denied, Alamria's opposition to Oncor's motion to dismiss will be deemed a motion to compel arbitration and will be reserved pending an evidentiary hearing, Alamria's motion for summary judgment as to Telcor will be denied, Oncor's motion for a protective order is denied, and Alamria's motion for provisional relief will be denied.

### I.

Alamria is a corporation principally located in Jedda, Saudi Arabia, and organized under the laws of that country. Oncor and Telcor are Delaware corporations; the principal place of business for both corporations is Bethesda, Maryland.

Oncor was incorporated in June 1992. Telcor was incorporated in June 1993. At some time either before or around the time of Telcor's incorporation, Oncor and Telcor entered into a "Sales, Accounting, and Management Services Agreement." [1] The agreement was signed for Oncor by L. Craig Thompson, treasurer for both corporations, and for Telcor by Kenneth E. Millard, president of both corporations. During the term of this agreement, Telcor would not "sell, transfer, encumber, lease or otherwise transfer or dispose of all or any portion of its supplier list or contracts without Oncor's prior Telcor Services Agreement [sic]. Telcor shall not sell, lease or otherwise dispose of any of Telcor's other assets which are necessary on a current basis for Oncor's business without the prior written consent of Oncor." [2]

In April and June of 1994, Telcor and Oncor respectively filed "Personal Property Return" forms with the Maryland State Department of Assessments and Taxation. On each of those forms, the two defendant corporations listed the same officers [3] and Haan was listed as the sole director of both corporations. Pursuant to Local Rule 103.3 (D.Md.1995), Telcor and Oncor have disclosed that Haan is the sole owner of both companies. On or about July 13, 1993, Oncor recorded a security interest in, among other things, Telcor's right, title and interest in

---

1. The document appears to be dated "1 Jan of 1993." Alamria's complaint alleges that the agreement was completed on or about June 1, 1993. Both of these dates antedate Telcor's incorporation. The agreement, however, states that Telcor is a "newly formed Delaware corporation." The agreement further indicates that the principal offices of Oncor and Telcor were located in the same suite in the same office building in Bethesda, Maryland.

2. The defendants indicate that this agreement is no longer in force pursuant to a termination agreement dated January 1, 1995.

3. For both corporations Kenneth E. Millard was listed as President, Joseph Switzer was listed as Vice–President, Stephen H. Lorberbaum (the sole incorporator of Telcor) was listed as Secretary, and L. Craig Thompson was listed as Treasurer. The same Bethesda, Maryland address was listed for each officer on both Oncor's and Telcor's Personal Property forms.

and to all accounts, chattel paper, deposit accounts, general intangibles, inventory, receivables, records, and all proceeds and products of any of these assets. On or about December 13, 1993, Haan recorded a financing statement securing the same Telcor assets.

The relationship between Alamria and the defendants began in late 1993. Alamria alleges that, at that time, the defendant Switzer (an officer and employee of both Oncor and Telcor) met with a representative of Alamria for the purpose of exploring a sales and marketing arrangement between Alamria and Telcor. Specifically, Alamria alleges that, in or around November 1993, Switzer met with an Alamria representative in London and discussed the possibility that Alamria would market prepaid calling cards and other telecommunications products for Oncor and Telcor. This arrangement was in connection with a planned expansion of the business of Oncor and Telcor into Europe and the Middle East.

On or about September 25, 1994, Alamria and Telcor entered into a three-year "Exclusive Marketing Consultancy Contract" ("the Contract") under which Alamria was to serve as the exclusive distributor of Telcor's prepaid telephone calling cards and other telecommunications products in several countries throughout the *Middle East and Northern Africa.*

Alamria contends that, around the time of the negotiation of the Contract, Switzer represented that Telcor was one of the leading telecommunications companies in the United States and was equipped with substantial personnel, equipment, facilities, expertise, products, and services. Furthermore, Amr H. Enany, President and Chief Executive Officer of Alamria, attests that, prior to executing the Contract, Switzer "led [Enany] to believe that he was acting on behalf of Telcor and Oncor, and that Telcor was in fact a part of Oncor." Enany also testified that Switzer led him to believe that he had the authority to bind both Telcor and Oncor to the Contract. *See* Enany Aff. ¶ 4. He further attests that Switzer and Telcor provided him

with literature and business proposals which represented that Telcor was a division of Oncor. *Id.* ¶¶ 6, 7, 9, 10.

Switzer *affirms that, at no time leading up* to the formation of the Contract, (1) did he ever made any statements to the effect that Oncor or anyone other than Telcor would be bound under the Contract; (2) did he ever represent to anyone associated with Alamria that Telcor was an agent for Oncor, (3) did he ever make representations to anyone associated with Alamria regarding Telcor's facilities, equipment and other resources, (4) was he acting on behalf of Oncor, (5) was he authorized by Oncor to make such representations, (6) did he ever represent that Telcor was a subsidiary of Oncor, and (7) did Enany review or have any knowledge of the contents of the marketing materials with which he would later be provided. Switzer Aff. pp. 1–3. Switzer's affidavit does not address Enany's allegations regarding Switzer's alleged representations and materials directed to Enany after the formation of the Contract.

On or about December 7, 1994, less than three months after entering into the agreement, Switzer notified Alamria that Telcor was ceasing operations and that Telcor would no longer accept new applications, activate new accounts, or provide customer or marketing support. Alamria contends that this act breached the three-year Contract between the parties.

Alamria then instituted the current action alleging a variety of counts of breach of contract against the two corporate defendants and the individual defendant Haan. In addition, Alamria alleges claims of fraudulent misrepresentation, or in the alternative, negligent or innocent misrepresentation, against all of the defendants. Finally, the complaint alleges claims of aiding and abetting the breach of the Contract and tortious interference with contract against Oncor and Haan.

As noted above, a contract containing an arbitration clause is at the center of this dispute. Citing the arbitration clause in the Contract, the defendant Telcor has moved to dismiss the complaint against it.[4] Oncor has

---

4. On November 6, 1995, this court issued an order providing the active parties in the case the

opportunity to clarify several issues and to brief certain questions of law the court believed to

moved to dismiss the complaint against it because, it maintains, there is no privity of contract between itself and Alamria, and because "Oncor had nothing to do with the Telcor/Alamria Contract."

## II.

The enforceability of arbitration agreements in contracts is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* Section 2, the centerpiece of the FAA, provides that a written arbitration agreement "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Chapter two of the FAA, 9 U.S.C. § 201 *et seq.*, implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"). Chapter two of the FAA and the Convention govern the duty to arbitrate in the context of international commercial transactions. *See* 9 U.S.C. § 202. The Convention provides:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> \* \* \* \* \* \*
>
> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Convention, art II, ¶¶ 1, 3. Unlike cases governed by chapter one of the FAA, cases subject to chapter two are deemed to "arise under" the laws of the United States, and district courts have original subject-matter jurisdiction of the cause regardless of the amount in controversy. 9 U.S.C. § 203. Once a court is satisfied that it has jurisdiction over the case, it "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.[5]

■ The FAA gives effect to a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), by creating "a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Id.* at 25 n. 32, 103 S.Ct. at 942 n. 32. While courts must ensure that private agreements to arbitrate be "rigorously enforce[d]," *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985), the court must first determine whether the parties intended to arbitrate a particular dispute. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (internal quotation marks and citation omitted). Therefore, a court must first decide (1) whether a party agreed to submit to arbitration, and (2) which disputes the parties agreed to submit to arbitration.

■ Generally, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* —— U.S.

---

apply to the instant case. As part of its response to the court's order, Telcor has indicated that the court should treat its Motion to Dismiss as a Motion to Compel Arbitration. *See Tennessee Imports, Inc. v. Filippi,* 745 F.Supp. 1314, 1322 n. 4 (M.D.Tenn.1990).

5. This section confers greater territorial reach to a court's power to compel arbitration than does § 4 of chapter one which authorizes a court to direct parties to arbitration only within its own district. *See* 9 U.S.C. § 4.

——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.,* —— U.S. ——, —— & n. 9, 115 S.Ct. 1212, 1219 & n. 9, 131 L.Ed.2d 76 (1995) (applying the law of Illinois (the forum state and the state where the contract was executed) and New York (the state indicated in the contract's choice of law clause) and citing the Restatement (Second) of Contracts and federal common-law for the proposition that a court should construe ambiguous language against the interest of the party that drafted it); *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989) (noting that "general state law principles of contract interpretation [apply] to the interpretation of an arbitration agreement," but the federal policy favoring arbitration counsels construing ambiguities in the arbitration clause itself in favor of arbitration); *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987) (noting that agreements to arbitrate are valid, irrevocable, and enforceable as a matter of federal law, but state law applies to questions "concerning the validity, revocability, and enforceability of contracts generally").

■ The question of arbitrability—whether a party is bound to arbitrate and what issues it is bound to arbitrate—is an issue for the courts, not the arbitrator, "[u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1418. Thus, if an agreement is silent or ambiguous regarding *who should determine arbitrability,* the issue is presumed to be a matter for the courts. However, if an agreement is silent or ambiguous regarding *whether a particular dispute is arbitrable,* the presumption is reversed, and it is assumed that the dispute is subject to arbitration. *See First Options,* —— U.S. at ——, 115 S.Ct. at 1924 (stating that "the law ... insist[s] on clarity before concluding that the parties did *not* want to arbitrate a related matter"). In other words, the federal body of law relating to arbitration agreements instructs

"that questions of arbitrability must be addressed with a healthy regard for the

federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*Moses Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941.

■ The policy favoring enforcement of arbitration agreements applies with particular force in the context of international commercial transactions subject to chapter two of the FAA. This special solicitude for arbitration agreements involving international trade derives from "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes." *Mitsubishi Motors,* 473 U.S. at 629, 105 S.Ct. at 3355 (allowing arbitration of antitrust claims in an international transaction "even assuming that a contrary result would be forthcoming in a domestic context"); *see also Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 515–20, 94 S.Ct. 2449, 2455–57, 41 L.Ed.2d 270 (1974); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320 (4th Cir.1988).

In heeding the Supreme Court's admonition to interpret expansively agreements to arbitrate, the Fourth Circuit employs a fact-based approach to determining the scope of arbitral issues. In *J.J. Ryan,* the Fourth Circuit was called upon to construe an international distribution agreement between a domestic importer and four foreign manufacturing affiliates of a French corporation. The court endorsed an approach to construing the scope of arbitrable claims which looks to the factual basis of the claim and its connection with the arbitration clause. The court instructed that "[t]o decide whether an arbitration agreement encompasses a dispute a court must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim." *J.J. Ryan,* 863 F.2d at 319 (citing *Mitsubishi*

*Motors,* 473 U.S. at 622 n. 9, 105 S.Ct. at 3351 n. 9). Applying this standard, the court first considered the arbitration clause at issue. The clause read: "All disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the Rules." *Id.* at 318. After noting that the federal policy favoring arbitration applies " 'with special force in the field of international commerce,' " *id.* at 319 (quoting *Mitsubishi Motors,* 473 U.S. at 631, 105 S.Ct. at 3356), the court affirmed the district court's referral of the following claims to arbitration: unfair trade practices, intentional and tortious interference with contract, conversion, abuse of process, libel, defamation, and injurious falsehood. The court held that these claims fell under the scope of the arbitration clause because they "involved factual issues arising in connection with the contracts." *Id.* at 319. The *J.J. Ryan* court then referred an additional claim to arbitration: civil conspiracy to destroy the importer's business and goodwill. The district court had retained jurisdiction over this claim in the proceedings below. The Fourth Circuit reasoned that, because the overt acts alleged in support of the conspiracy count "establish that the disputes involving them arose in connection with the distribution agreements," the district court should have referred that claim to arbitration as well.

### III.

#### A.

The arbitration clause in this case provides, in full:

> Disputes hereunder shall be finally settled under the Rules of Conciliation and Arbitration of the ICC by three arbitrators conducting their proceedings in Paris in the English language and substantively governed by English law. If any provision hereof is unenforceable in any jurisdiction, such shall not affect its enforceability elsewhere. The prevailing party in any such arbitration shall be entitled to an award of its reasonable attorney's fees, costs, and disbursements.

Contract, Art. 29. The Fourth Circuit has made it clear that it will broadly construe arbitration clauses such as the one in this case. For example, in *Local Union No. 637, IBEW v. Davis H. Elliot Co.,* 13 F.3d 129 (4th Cir.1993), the court described an arbitration clause as "broad" which required arbitration of "differences arising with respect to interpretation of this contract or the performance of any obligation hereunder." *Id.* at 132 & n. 2. The court stated not only that this language was broad, but also that it "assigned to arbitration *all* disputes *relating to* the agreement or its interpretation." *Id.* at 132 (second emphasis supplied). It bears emphasis that *Local 637* was a domestic arbitration case, not involving chapter two of the FAA, and claims may be referable to arbitration under chapter two "even assuming that a contrary result would be forthcoming in a domestic context." *Mitsubishi Motors,* 473 U.S. at 629, 105 S.Ct. at 3355.

#### B.

As noted above, Telcor moves to dismiss this action pursuant to the arbitration provisions of Article 29 of the Contract and the FAA. This court will treat the motion to dismiss as a motion to compel arbitration.

Alamria's breach of contract claims against defendant Telcor are based on:

(1) Telcor's December 7, 1994 notification that it was ceasing operations;

(2) Telcor's alleged breach of its contractual duty to "conduct its business in a manner that will reflect favorably at all times on [Alamria] in order to maintain [Alamria's] good name and reputation," Contract Art. 7, through its alleged failure to provide services and competitive rates and its alleged questionable business practices;

(3) Telcor's alleged breach of its contractual duty to abide by the agreement in good faith, Contract Art. 32, by allegedly (i) entering into the Contract knowing that it would not honor the agreement, (ii) terminating the Contract unjustifiably, (iii) making false and fraudulent representations, and (iv) failing to disclose that it was substantially undercapitalized.

Alamria's fraudulent, negligent, and innocent misrepresentation claims against Telcor are based on Telcor's allegedly having made false statements prior to and after the execution of the Contract. Alamria's fraud claims include an allegation that Telcor fraudulently induced it to enter into the Contract.

Because it is undisputed that both Alamria and Telcor are signatories to the Contract containing the arbitration clause, both parties have manifested their intent to submit to arbitration. The next question for the court is the scope of the universe of disputes the parties agreed to arbitrate.

All three of Alamria's breach of contract claims against Telcor, by definition, are "disputes hereunder" within the meaning of the broadly worded arbitration clause of the Contract. This conclusion is required not only by the plain language of the clause, but also by the court's holding in *Peoples Security Life Ins. Co. v. Monumental Life Ins. Co.,* 867 F.2d 809 (4th Cir.1989). In that case, claims of fraud in the inducement of the contract were deemed arbitrable under a clause requiring arbitration of " '[a]ny question, charge, complaint, or grievance believed to constitute a breach or violation' of the Agreement." *Id.* at 810 (alteration in original); *see also Local 637,* 13 F.3d at 132. This conclusion also is supported by the directives in *Mitsubishi Motors* and *J.J. Ryan* to construe international arbitration clauses especially broadly.

■ The claims involving fraudulent, negligent, or innocent representations involve statements which relate to Telcor's status as a telecommunications company, its capabilities, equipment and expertise. The statements allegedly made by, or on behalf of Telcor, relate to "factual issues arising in connection with the contract [ ]," *J.J. Ryan,* 863 F.2d at 319, and are therefore arbitrable under the Contract. *See Scherk,* 417 U.S. at 508 n. 1, 94 S.Ct. at 2452 n. 1 (holding that a clause requiring arbitration of "any controversy or claim [that] shall arise out of this agreement or the breach thereof" was sufficiently broad to cover a 1934 Securities Act claim involving fraudulent misrepresentation).

■ Alamria contends that Telcor's alleged fraudulent misrepresentations induced Alamria to enter into the Contract, and that a claim of fraud in the inducement of the contract is properly for this court to consider because it is outside the scope of the arbitration clause. Alamria's first obstacle in pressing this argument is the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). In *Prima Paint,* the Court held that, unless the parties manifest a contrary intention (through the scope of their arbitration clause), a court should refer claims of fraud in the inducement of the *entire contract* to arbitration but should resolve claims of fraud in the inducement of the *arbitration clause* on its own. *Id.* at 403–04, 87 S.Ct. at 1806.

The critical factors to be considered in evaluating *Prima Paint's* relevance to this case are (1) the applicability of the Convention to the current case, and (2) the relative breadth of the arbitration clause in the two cases.

■ With respect to the relevance of the Convention to this issue, I turn first to the policies that inform the interpretation of the FAA and then consider the statutory language in light of those policies. First, as mentioned above, a court must construe arbitration clauses in international commercial contexts particularly expansively. *Mitsubishi Motors,* 473 U.S. at 629, 105 S.Ct. at 3355. Second, the result in *Prima Paint* was based on the language of § 4 (chapter one) of the FAA. Section 4 applies when a party petitions a court for an order compelling another party to arbitrate. When a petition is made under this section, the court must direct the parties to arbitration after it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. From this language, the *Prima Paint* Court concluded that, while a court must examine a claim of fraud in the inducement of the arbitration clause ("the making of the agreement for arbitration"), "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint,* 388 U.S.

at 404, 87 S.Ct. at 1806. The Court then stated that Congress could not have intended the result to be different in situations where a party moves the court for a stay of ongoing proceedings so that arbitration may take place, see 9 U.S.C. § 3, and applied the § 4 standard to § 3 even in the absence of parallel language in the latter section. *See id.*

Under chapter two of the FAA, no such language exists. However, chapter one of the FAA applies to cases governed by chapter two provided that the provisions of chapter one are not "in conflict" with those of chapter two or the Convention as ratified by the United States. *See* 9 U.S.C. § 208. The power of a court to compel arbitration is simply stated in § 206: "A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for...." 9 U.S.C. § 206. This language clearly does not preclude the same conclusion reached in *Prima Paint. See e.g., S.A. Mineracao Da Trindade–Samitri v. Utah Intern. Inc.*, 745 F.2d 190, 195 (2d Cir.1984) (citing *Prima Paint* for the proposition that "[u]nless excluded, claims of fraud in the inducement of a contract are arbitrable" in the context of a contract governed by chapter two).

I next consider what meaningful difference there is, if any, between the relative breadth of the arbitration clauses in *Prima Paint* and this case. Alamria has cited a number of cases from other jurisdictions in which the courts have found claims of fraud in the inducement of the contract appropriate for judicial resolution where the language of the arbitration clause was similar to the language of the arbitration clause in the instant case. In essence, the cases cited by the plaintiff distinguish between two types of arbitration clauses. The first type of clause addresses disputes "arising hereunder" or "arising out of the agreement." The second, and arguably broader, type of clause requires arbitration of claims "arising under *or relating to* this agreement." The clause in *Prima Paint* read: "Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitra-

tion...." *Prima Paint,* 388 U.S. at 398, 87 S.Ct. at 1803.

It appears that the trend of the cases generally, particularly in the international context, is to attribute little significance to such distinctions in the phrasing of arbitration clauses. In an early case, the Second Circuit held that the phrase "[a]ny controversy or claim arising out of or relating to this contract" is sufficiently broad to cover a claim of fraud in the inducement but the phrase "[i]f any dispute or difference should arise under this Charter" is not. *See In re Kinoshita & Co.,* 287 F.2d 951, 952–53 (2d Cir.1961); *see also Michele Amoruso E Figli v. Fisheries Development Corp.,* 499 F.Supp. 1074, 1080 (S.D.N.Y.1980) (following *Kinoshita* and noting that the omission of the phrase "relating to" is significant in the Second Circuit); *Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir.1983) (citing *Michele Amoruso* with approval and concluding that "arising hereunder" is intended to cover a much narrower range of disputes than "arising out of or relating to").

Although it is still good law in the Second Circuit and followed in the Ninth, the continued vitality of *Kinoshita* has been called into serious question both in the Second Circuit and elsewhere. In *S.A. Mineracao Da Trindade–Samitri v. Utah Intern., Inc.,* 745 F.2d 190 (2d Cir.1984), the Second Circuit limited *Kinoshita* to its precise facts, but refused to overrule the case because contracting parties may have relied on it in formulating language for their arbitration clauses. The court was clear in recognizing that *Kinoshita*'s reasoning is inconsistent "with federal policy favoring arbitration, particularly in international business disputes." *Id.* at 194; *see also Mar–Len of Louisiana, Inc. v. Parsons–Gilbane,* 773 F.2d 633, 637 (5th Cir.1985) (noting that "the Second Circuit itself observed that *Kinoshita* is inconsistent with federal policy favoring arbitration"). *But see Tracer Research Corp. v. National Environmental Services Co.,* 42 F.3d 1292, 1295 (9th Cir. 1994) (equating "arising out of" with "arising under" and adhering to the logic of *Kinoshita* and its progeny).

The Fourth Circuit has similarly refused to take the restrictive approach of the *Kinoshita* line of cases. In *Peoples Security,* the court construed an arbitration clause containing the following language:

Any question, charge, complaint or grievance believed to constitute a breach or violation shall be immediately communicated between counsel and the party alleged to be in breach of the agreement shall have five days to respond, correct or justify its action. If the aggrieved party is not then satisfied, the matter shall be submitted to the American Arbitration Association for final and mutually binding resolution by it including the award of damages or other relief.

*Peoples Security,* 867 F.2d at 810 n. 1. The court held that this language was broad enough to encompass a claim of fraud in the inducement of the agreement. *Id.* at 813–14. In so holding, the court reversed the determination by the district court that the arbitration clause in question was not broad enough to cover the fraudulent inducement claim. The *Peoples Security* court cited with approval several cases from other jurisdictions construing language similar to that contained in the Alamria/Telcor Contract. *See e.g., S.A. Mineracao,* 745 F.2d at 192 (holding that a clause requiring arbitration "[w]henever any question or dispute shall arise or occur under this [Agreement/Contract]" was sufficiently broad to cover a claim of fraudulent inducement) (second alteration in original); *Life of America Ins. Co. v. Aetna Life Ins. Co.,* 744 F.2d 409, 410 n. 1, 413 (5th Cir.1984) (holding that a clause requiring arbitration if "any dispute arises by the parties hereto as to the rights or liabilities incident to this Agreement" is broad enough to cover claims alleged under Texas statutes governing insurance and deceptive trade practices). At least one court has speculated that *Peoples Security* is one of several cases

to "call the continued authority of *Kinoshita* into even further doubt." *Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc.,* 760 F.Supp. 1036, 1044 (E.D.N.Y.1991):

At the very least, there is ambiguity concerning whether the arbitration clause covers claims of fraudulent inducement. In light of the requirement that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941, particularly where the contract involves an international commercial transaction, *Mitsubishi Motors,* 473 U.S. at 629, 105 S.Ct. at 3355, Alamria's claim of fraudulent inducement against Telcor should be arbitrated with the claims for breach of contract and misrepresentation.[6]

### C.

Alamria has named Oncor as a co-defendant with respect to each of the claims of breach of contract and misrepresentation alleged against Telcor. In addition, Alamria alleges that Oncor "aided and abetted" Telcor's alleged breach of contract and misrepresentation, and also that Oncor has tortiously interfered with the Alamria–Telcor Contract.[7] Alamria is alleging that a principal-agent relationship exists between Oncor and Telcor, or, in the alternative, Alamria urges this court to pierce Telcor's corporate veil and hold Oncor liable for Telcor's actions.

Oncor has filed a motion to dismiss these claims against it.[8] It argues that it is not directly liable on the Contract because it is a non-signatory and it denies vicarious liability because it states that no relationship exists between itself and Telcor which would justify holding it liable for Telcor's actions. While Telcor has stated that it intends for this court to construe its motion to dismiss as a motion to compel arbitration, Oncor has ex-

---

6. Because Alamria's claims of fraudulent misrepresentation and breach of contract against Telcor must be referred to arbitration, Alamria's motion for summary judgment as to these claims is denied.

7. Alamria also presses these latter two claims of "aiding and abetting" and tortious interference against the individual defendant Haan.

8. Oncor has not indicated specifically which counts it is urging this court to dismiss. I will assume that it wishes to have the entire complaint dismissed as to it.

pressed no such intention, insisting that it does not belong in this lawsuit. I turn now to the question whether Oncor is bound to the terms of this Contract and the arbitration clause.

"When there is a dispute as to the scope of the arbitration agreement, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator, '[u]nless the parties clearly and unmistakably provide otherwise.'" *Summer Rain v. Donning Company/Publishers, Inc.*, 964 F.2d 1455, 1459 (4th Cir.1992) (alteration in original) (quoting *AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1418).

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint for failure to state a claim upon which relief can be granted. The purpose of this rule is to test the legal sufficiency of the claim. On a motion to dismiss, the court must view the allegations in the complaint in the light most favorable to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Specifically, the court must accept the allegations contained in the complaint as true, and must liberally construe the complaint as a whole. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir.1990). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Faulkner Advertising Assoc. v. Nissan Motor Corp*, 905 F.2d 769, 771–72 (4th Cir.1990).

■ Alamria alleges that Oncor is not entitled to dismissal of its claim that Oncor is directly liable for breach of the Contract because it has been bound under the Contract with Telcor under Article 20. This provision of the Contract reads, in full:

The Client [Telcor] hereby agrees that any other business entities, affiliates, individuals, subsidiaries, or the like, of the Client that exist or shall be created in the future is part of this agreement and shall not do any projects in the Territory through any other business entities, affiliates, individuals, subsidiaries, or the like.

The Client acknowledges and hereby agrees that the breach of Article (20) in whole or in part constitutes unrepairable [sic] damages to the Consultant [Alamria] and therefore agrees to unconditionally indemnify the Consultant for all such damages as deemed appropriate.

It appears that if Oncor is a business entity, affiliate, individual, subsidiary, or the like, of Telcor, then it may be bound directly under the Contract, and is subject to the arbitration clause as is Telcor.[9]

There is no reference to Oncor in the Contract, and Oncor is not a signatory to the Contract. Moreover, none of the terms "business entity, affiliate, individual, subsidiary" or "the like" are defined in the Contract. However, as discussed above, there is evidence in the record which sheds some light on the relationship between the parties.[10] For example, at the times relevant to this dispute, the defendant Haan was the sole owner and director of Telcor and Oncor. Additionally, the two companies had the same officers in common and listed the same suite of offices in Bethesda as the principal place of business for both corporations.

Oncor is neither a "subsidiary" of Telcor, nor an "individual" of Telcor. However, in its complaint, Alamria alleges that "[d]efendants intended to induce plaintiff to believe that one of the 'affiliates' to which this paragraph referred was Oncor and that one of the 'individuals' was defendant Haan." Complaint ¶ 43.

---

**9.** Alamria has raised the issue of Oncor's possible waiver of its rights to insist on arbitration because Oncor has denied that it has any duty under the Contract whatsoever. The waiver issue is discussed *infra*.

**10.** "[I]n deciding Rule 12(b)(6) motions, courts may consider matters of public record, items

appearing in the record of the case, as well as exhibits attached to the complaint." *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir.1995) (citing 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357 (1990)).

Taking the plaintiff's allegations in the complaint as true, and liberally construing the complaint as a whole, as I must, I can not say without doubt that the plaintiff could present no set of facts entitling it to relief. I must, therefore, deny Oncor's motion to dismiss the complaint.

**IV.**

This does not end the matter as to Oncor, however. Alamria has requested that Oncor's motion to dismiss be treated as a motion to compel arbitration if this court decides that it can not hear the claims against Oncor and if Oncor has not waived any right to seek arbitration.

I will therefore treat Alamria's opposition to Oncor's motion to dismiss as a motion by the plaintiff to compel arbitration. Under these circumstances, the issue of waiver does not apply because the party alleged to have waived the right to seek arbitration (Oncor) is not seeking arbitration. Oncor is continuing to oppose any involvement in this case as it has a right to do. If, to avoid waiver, Oncor had sought arbitration, it could not later object to being bound by the Contract and the arbitrator's decision. *See Summer Rain,* 964 F.2d at 1462 n. 6. The Maryland Court of Appeals has observed that "a party against whom a claim is asserted, and who is not therefore seeking relief, does not have an obligation to initiate arbitration. It is antithetical to the interests of such a party to itself initiate a proceeding, be it a court suit or arbitration, that would expose it to the risk of liability." *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 468 A.2d 91, 100 (1983).

 Oncor argues that it should not be compelled to arbitrate because there is no writing between Oncor and Alamria and a writing between the parties is a "fundamental prerequisite" to compelling arbitration. While it is true that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *AT & T Technologies,* 475 U.S. at 648, 106 S.Ct. at 1418 (internal quotation marks and citation omitted), there is no strict requirement that only signatories to an agreement be susceptible to

compelled arbitration. *See Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) ("This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.' ") (citation omitted); *McCarthy v. Azure,* 22 F.3d 351, 356 (1st Cir.1994) ("To be sure, the law recognizes certain contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from, agreements signed by others, and these principles can apply to arbitration provisions."); *Barrowclough v. Kidder, Peabody & Co., Inc.,* 752 F.2d 923, 938 (3d Cir.1985) ("[A] variety of non-signatories of arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles."), *overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1115 & n. 5 (3d Cir.1993).

In *J.J. Ryan,* the Fourth Circuit upheld the district court's referral of a parent company to arbitration over the objection of the plaintiff where the parent was not a party to the arbitration agreement but the underlying dispute involved issues of law and fact common to the parent and the subsidiaries. The court stated:

> When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.... 'If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'

*J.J. Ryan,* 863 F.2d at 320–21 (quoting *Sam Reisfeld & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir.1976)). *J.J. Ryan* is distinguishable from the instant case, however. In *J.J. Ryan,* the plaintiff/signatory to the agreements sought judicial resolution of the disputes and the nonsignatory parent was willing to submit the disputes to arbitration. *Id.* at 320. Moreover, in *J.J. Ryan,*

the parent/subsidiary relationship between the defendants was undisputed.[11]

In *Pritzker*, trustees of a pension plan sued a brokerage firm, a financial consultant, and the sister corporation of the brokerage firm for violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The financial consultant, an employee of the brokerage firm, made investment purchases for certain "Cash Management Accounts for Retirement Plans" opened on behalf of five profit-sharing trusts which held the trustees' assets. The sister corporation, which shared a common parent with the brokerage firm, was an asset management firm which was the custodian of the accounts. The trustees executed an agreement for each of the trusts which provided that all controversies between the trustees and the brokerage firm were to be resolved in an arbitral forum. The brokerage firm, but not the financial consultant or the sister corporation, signed the agreement containing the arbitration provision. The trustees alleged that the sister corporation was liable for its "knowing participation" in the alleged violations of ERISA because it credited purchase transactions to the accounts and the corporation may have acted as the sponsor of the fund. *See Pritzker*, 7 F.3d at 1112–13. The three defendants moved to compel arbitration of the dispute, and the signatory trustees opposed arbitration of the dispute with the nonsignatory defendants. In holding that the sister corporation was entitled to an arbitral forum, the *Pritzker* court observed that "it [was] not exactly clear what role [the sister corporation] played in the alleged statutory violations." *Id.* at 1122. However, the court noted that the sister corporation "was obligated to perform certain services in connection with the Accounts opened by the Trustees," was a subsidiary in common with the brokerage firm of a third corporation, and "may be an alter ego of [the brokerage firm]." *Id.* This case is distinguishable from the instant matter because, as

in *J.J. Ryan*, it was the nonsignatories who sought arbitration, not the signatory/plaintiff.

In *Thomson–CSF* a corporation engaged in the manufacture of flight simulators entered into a "Working Agreement" with a computer equipment manufacturer. The working agreement was, in essence, a mutual exclusive purchasing and distribution agreement. The working agreement provided for the arbitration of all disputes between the "parties" to the agreement and their "affiliates." The term "affiliates" was described in the agreement as follows:

> An 'affiliate' of a party hereto shall mean any person, firm or corporation that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such party.

*Thomson–CSF*, 64 F.3d at 775. The simulator manufacturer was subsequently purchased by another company and then sold to Thomson which integrated it into its flight simulation equipment division. Prior to the acquisition of the simulator manufacturer, Thomson engaged in negotiations with the computer equipment manufacturer and took the position, from which it never retreated, that it did not consider itself bound by the working agreement which it had neither negotiated nor signed. *Id.* After some time, the computer equipment manufacturer filed a demand for arbitration with the subsidiary simulator manufacturer and the parent, Thomson. Thomson filed a suit for declaratory and injunctive relief opposing arbitration. The computer equipment manufacturer cross-moved to compel Thomson to arbitrate. The district court granted the motion to compel because of "its conduct in voluntarily becoming … an affiliate, … the degree of control Thomson exercises over [the subsidiary], and … the interrelatedness of the issues." *Id.* at 776 (internal quotation marks omitted).

The Second Circuit reversed, repeatedly emphasizing that the district court had

---

**11.** At least in the Second Circuit, the doctrine of alter ego is used to determine whether a nonsignatory which is part of a parent/subsidiary relationship should be bound to an arbitration agreement. If no parent/subsidiary relationship exists, traditional principles of agency law may substitute for an alter ego analysis. *See In re Arbitration between Keystone Shipping Co. and Texport Oil Co.*, 782 F.Supp. 28, 32 n. 2 (S.D.N.Y.1992).

erred in failing to evaluate the issue by utilizing "ordinary principles of contract and agency." *Id.* (internal quotation marks and citations omitted). The *Thomson* court identified five bases for binding nonsignatories to the arbitration agreements of others: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id.* The court stated that, while arbitration agreements should be construed liberally to favor such agreements, they "must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." *Id.*

The *Thomson* court examined each of the bases for binding nonsignatories within the context of the case. First, the court observed that the "incorporation by reference" basis did not apply because the working agreement was never incorporated into any document that Thomson adopted. Second, Thomson could not be bound under an "assumption" theory because, although it was aware that the working agreement purported to bind it as an "affiliate," Thomson explicitly rejected the suggestion that it would be bound by the agreement. Third, the court stated that traditional principles of agency law could not bind Thomson because the working agreement was entered into well before Thomson purchased the signatory manufacturer. Fourth, the court examined the "veil piercing/alter ego" basis. The court noted nonsignatories may be bound under this theory "to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary." *Id.* (internal quotation marks and citation omitted). The computer equipment manufacturer argued that this theory supported its claim because of Thomson's domination of its subsidiary. The court refused to pierce the corporate veil, however, because, after examining the totality of the circumstances, it found there was no abandonment of the corporate structure, there was no lack of corporate formalities, and there was no intermingling of corporate finances and directorship. *Id.* at 778. Fifth, the court examined the estoppel basis, but found it inapplicable. The court disagreed with the finding of the district court that Thomson received a sufficient direct benefit

to estop it from avoiding arbitration. The court found that Thomson indirectly benefitted from eliminating the subsidiary as a competitor, but did not directly benefit from the working agreement because it never sought to purchase equipment from the computer equipment manufacturer or enforce the exclusivity provisions of the agreement. The court stated that, had that been the case, estoppel would prevent Thomson from avoiding the agreement.

Finally, the court examined a line of cases from other circuits which employed a different estoppel theory to bind signatories and nonsignatories. In these cases, nonsignatories were entitled to compel arbitration with a signatories because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [because] the claims were intimately founded in and intertwined with the underlying contract obligations." *Id.* at 779 (internal quotation marks and citations omitted). The *Thomson* court distinguished this line of cases because Thomson was the party resisting arbitration. In other words, under this line of cases, Thomson could not be estopped from denying the applicability of the arbitration clause because it was not a signatory benefitting from the agreement. Alternatively, the court concluded that Thomson could not be estopped because the claims against Thomson (as opposed to those against the subsidiary) were ancillary to the working agreement and not "integrally related" to it. *Id.* at 779–80.

The court then rejected the "hybrid" approach taken by the district court which looked to a variety of factors to bind Thomson to the agreement based on a totality of circumstances without clearly relying on any of the five traditional bases for binding nonsignatories to arbitration agreements. The court concluded that

[t]he district court's hybrid approach dilutes the safeguards afforded to a nonsignatory by the 'ordinary principles of contract and agency' and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements. Anything short of requiring

a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations.

*Id.* at 780.

In *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519 (2d Cir.1980), a case somewhat more factually similar to the instant matter, the Second Circuit reversed the district court's determination that certain nonsignatory companies were not parties to an arbitration agreement. In that case, a tugboat company contracted with two affiliated transporters of sludge for the purpose of providing towing services for the transporters' sludge removal operations. The contract bound the companies, their "affiliates" and "subsidiaries," and "all other companies of substantially the same stock ownership" as the parent companies. An arbitration clause in the contract bound the signatories to arbitration of disputes related to performance under the contract. The transporters abandoned the contract, and, consequently, the tugboat company sued to compel arbitration with the transporters as well as with two nonsignatory companies which were allegedly "affiliated with" the transporters. The district court refused to refer the nonsignatory companies to arbitration because they were not parties to the agreement. *Id.* at 520–21. The plaintiff argued that the affiliated companies should be bound because

> both [affiliated nonsignatory companies] were corporations formed by the Miele family, ... these corporations owned at least one-third of the stock of [the signatory companies], ... Anthony P. Miele, Jr., was the controlling shareholder of [the affiliated nonsignatory companies] and had complete authority to bind these companies as well as [the signatory companies] to the contract with [the tugboat company], ... [the signatory companies] were described as affiliated companies in [one of the affiliated nonsignatory companies'] annual report, and ... the various dealings between the parties indicated that all four companies considered themselves bound by and acted in accordance with the terms of the contract until [the tugboat company's] services were cancelled.

*Id.* at 523. Because the district court relied only upon "the parties' affidavits and memoranda of law" in reaching this decision, the court of appeals, on a "scanty record," remanded the case for a hearing, in light of § 4 of the FAA which provides: "[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof." *Id.* at 524 (quoting 9 U.S.C. § 4). The court suggested that the parties might, in the discretion of the district court, all proceed to arbitration and hold a hearing later on whether the nonsignatories are liable under the contract if necessary. *Id.*

The Contract in the instant case was signed by Amr H. Enany, President and CEO of Alamria and Joseph F. Switzer, Jr., Chief Operating Officer of Telcor International. Nowhere in the Contract is Oncor mentioned, and the signature line indicates that Switzer signed the Contract as a representative of Telcor. Alamria argues that the Contract contemplates that Oncor is bound through the clause binding "other business entities, affiliates, individuals, subsidiaries, or the like" of Telcor. Alamria avers in its complaint that "defendant Switzer ... made statements designed and calculated to lead plaintiff to believe ... that Telcor was a part of Oncor, and that Oncor would be bound by any agreement reached with plaintiff and would be obligated to provide any personnel, equipment, facilities, expertise, products or services not provided by Telcor." Complaint ¶ 35. This allegation is echoed in the affidavit of Amr Enany, who swears that these representations were made to him personally during negotiations leading up to the Contract. Enany Aff. ¶¶ 2, 4, 14. While Switzer does not dispute that the discussions and negotiations leading up to the execution of the Contract were exclusively between himself and Enany, Switzer Aff. ¶ 5, he does deny that, during the negotiations leading up to the signing of the Contract, he ever represented that anyone other than Telcor would be bound by the Contract or that he was acting on behalf of Oncor or that he was authorized to do so, *id.* ¶¶ 6, 8, 12, 14. Further, Alamria alleges that "[d]efendants intended to induce plaintiff to believe that one of the 'affiliates' to which [the Contract] referred was Oncor and that one of the 'individ-

uals' was defendant Haan." Complaint ¶ 43. The complaint further avers that, "[p]ursuant to the Management Agreement between Telcor and Oncor, Oncor had the authority to administer that Contract, and further, Telcor was not allowed to terminate or otherwise dispose of that Contract without the approval of Oncor, which was governed by defendant Haan, as its sole director." Complaint ¶ 46. Alamria also contends that "Telcor and Switzer promised that Telcor and Oncor would provide services, equipment and other items necessary to service the prepaid calling cards and other products to be sold pursuant to the Contract." Complaint ¶ 48.

The Contract in this case is an integrated agreement. As such, Oncor argues, evidence of prior negotiations and discussions is inadmissible to show that the parties manifested an intention to bind Oncor to the Contract as an "affiliate." Paragraph 25 of the Contract, which was drafted by Alamria, reads in full:

> This contract constitutes the entire agreement between the Client [Telcor] and the Consultant [Alamria] and supersedes any and all prior and contemporaneous agreements between the parties. This contract may only be amended in writing, it states the entire agreement between the parties and neither party has relied on any representations or warranties, which are not set forth in this contract, from the other in entering into this contract.

Contract ¶ 25. The Restatement (Second) of Contracts § 209(3) (1981) provides, in full:

> Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.

The Restatement provides that if a writing is a complete integration (a preliminary determination made by the court, *see* Restatement (Second) of Contracts § 210(3)), parol evidence of a prior agreement within the scope of the integrated agreement may not be considered by the trier of fact. *See id.* §§ 213(2), 216. However, parol evidence is admissible to explain what the parties meant to express when using an ambiguous term in an integrated agreement. *See id.* § 214(c) & cmt. b., illus. 2.[12]

■ Turning to the terms of the Contract itself, there is little in the way of guidance to support Alamria's claim that the parties intended that Oncor was an "affiliate" of Telcor for the purposes of binding Oncor to the Contract. Generally, an "affiliate" is defined as a "[c]ompany effectively controlled by another company. A branch, division, or subsidiary.... Corporations which are related as parent and subsidiary, characterized by identity of ownership of capital stock." Black's Law Dictionary 58 (6th ed. 1990). Even if this definition could be construed to support Alamria's position, it is insufficient in its definiteness and authority to justify a holding that Oncor is bound to the Alamria/Telcor Contract. Moreover, Alamria has failed to cite and this court is unaware of, any cases indicating that the term "affiliate" is commonly used to describe the relationship between Telcor and Oncor. However, there is a sharp dispute of fact regarding what Switzer represented, if anything, to Enany regarding whether Oncor would be bound under the Contract.[13] Because the term "affiliates" as used in this Contract is ambiguous, Alamria will be given an opportunity to prove, at an evidentiary hearing, that the parties manifested an intent for the term to refer to Oncor.

■ Oncor may also be bound to the Alamria/Telcor Contract, including the arbi-

---

12. The parties have cited only Maryland law as applying to the construction of the Contract, and the record does not indicate that the law of any other jurisdiction applies. For the rule in Maryland on the use of parol evidence in this context, *see Helferstay v. Creamer*, 58 Md.App. 263, 473 A.2d 47, 52, *cert. denied*, 300 Md. 794, 481 A.2d 239 (1984), where the court stated that "parol evidence may not be admitted to vary, explain or contradict the written contract but this rule does not preclude the admission of parol evidence to explain an ambiguous term." *Cf. Sidhu v. Shigo*, 61 Md.App. 61, 484 A.2d 1033 (1984).

13. Extrinsic evidence may be used to determine *whether* a term in a contract is ambiguous. *See Admiral Builders Sav. and Loan Ass'n v. South River Landing, Inc.*, 66 Md.App. 124, 502 A.2d 1096, 1099 (1986).

tration clause, by means of traditional principles of agency. *See Thomson–CSF*, 64 F.3d at 777 ("Traditional principles of agency law may bind a nonsignatory to an arbitration agreement."); Convention art. II, ¶ 1 (requiring Contracting States to enforce arbitration agreements between parties "in respect of a defined legal relationship, whether contractual or not"). As an officer of Oncor, Switzer may have bound Oncor to the Alamria/Telcor Contract even though he signed the Contract as an officer of Telcor. In fact, under the doctrine of apparent authority, Switzer, with the appropriate representations, could have bound Oncor to the Contract even absent its intention to be bound. The Maryland courts define apparent authority as follows:

> Apparent authority may arise when the actions of the principal, reasonably interpreted, cause a third person to believe in good faith that the principal consents to the acts of the agent. Apparent authority also may arise when the principal knowingly permits the agent to act in a certain manner as if he were authorized. The action or manifestation of authority giving rise to the reliance must be that of the principal, and the reliance by the third person on the action or manifestation of authority must be reasonable.

*Atlantic Richfield Co. v. Sybert,* 51 Md.App. 74, 441 A.2d 1079, 1085 (1982) (quoting *Miller v. Mueller,* 28 Md.App. 141, 343 A.2d 922, 926 (1975), *aff'd,* 295 Md. 347, 456 A.2d 20 (1983)). In the *Sybert* case, the Atlantic Richfield Company ("Arco") was attempting to sell three parcels of real estate. One of Arco's employees, George Tracy, was involved in negotiations with two attorneys and representatives of the purchasing corporation. In October 1974, at a pre-conference meeting, Tracy allegedly told the two attorneys involved in the deal that they would be entitled to real estate commissions in the event that the deal would be completed. Tracy admitted that the meeting with the attorneys took place, but denied promising the commissions. After the deal was completed, the attorneys requested their commissions from Arco, and Arco denied the claim. On appeal, the court held there was sufficient evidence in the record for the trial court to have found by a preponderance of the evidence that Tracy had at least apparent authority to enter into an express or implied contract with the attorneys for the commissions. The court noted the following in support of its holding:

> The trial court had before it evidence that Tracy's official job title with Arco was 'Real Estate Manager, Special projects'; that in February, 1974 he was assigned to act as coordinator for [one of the properties being sold]; that from February, 1974 until his retirement in December, 1974, Tracy was [Arco's] primary contact with [the attorney] concerning the [property]; that he was the representative of Arco when the conference was arranged between [the attorneys, the purchasing corporation,] and himself acting on behalf of Arco; that he attended the pre-conference between [the attorneys] and himself at which he admits the question of 'compensation' for [the attorneys] was discussed in the event a deal with [the purchasing corporation] was arranged, but contends no brokerage commissions were mentioned; and that he advised [a co-worker at Arco] by letter that as a result of the conference between the [attorneys, the purchasing corporation,] and himself there was some interest on the part of [the purchasing corporation] in the purchase of [an alternate property to be sold]. Upon a full consideration of the testimony in the record extracts and the exhibits offered in support of the testimony, we do not find that the trial judge, having the benefit of the appearance of the witnesses before him, erred in concluding that Tracy was clothed with at least apparent authority to enter into the agreement testified to by [the attorneys].

*Id.* 441 A.2d at 1085.

In the instant case, Alamria has presented sufficient evidence, through affidavits and documentary evidence, to create a genuine triable issue regarding whether Switzer bound Oncor to the Alamria/Telcor Contract by means of actual or apparent authority. *See I.S. Joseph Co. v. Michigan Sugar Co.,* 803 F.2d 396, 400 (8th Cir.1986) ("[A]n allegation that a purported agent had no power to bind his principal to an arbitra-

tion contract goes to the existence of the agreement and must therefore be decided by the court."); *McAllister*, 621 F.2d at 524 ("[T]he district court was required to hold an evidentiary hearing on [the] claim that [the nonsignatory 'affiliates'] were bound by the contract"); *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 6–7 (2d Cir.1981) (remanding for an evidentiary hearing on whether the nonsignatory movant to compel arbitration was an undisclosed principal and therefore entitled to enforce the arbitration clause). The parol evidence rule does not bar the admission of evidence related to the question whether Switzer bound Oncor to the Telcor/Alamria Contract as an actual or apparent agent. *See e.g. Richards v. General Motors Corp.*, 991 F.2d 1227, 1231–33 (6th Cir.1993); *Lear v. Equitable Life Assur. Soc. of U.S.*, 798 F.2d 1128, 1131 (8th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1001 (1987).[14] Because Alamria is entitled to an evidentiary hearing on whether Oncor must proceed to arbitration, Oncor's motion for a protective order will be denied.

## V.

■ Alamria has moved this court for a prejudgment attachment against Oncor because it fears that Oncor will dissipate its assets during the resolution of this dispute. The Fourth Circuit has held that an attachment and superseding bond is contrary to a party's arbitration agreement as well as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *See I.T.A.D. Assoc., Inc. v. Podar Bros.*, 636 F.2d 75, 77 (4th Cir.1981). This court is aware that other courts have taken different approaches, *see Tennessee Imports*, 745 F.Supp. at 1329, however *Podar* is control-

ling in this Circuit. Alamria's motion for provisional relief must, therefore, be denied.

---

14. Alamria has named Oncor along with Telcor as the corporate defendants for the following counts: breach of contract (including the breach of the duty of good faith and fair dealing); and fraudulent, negligent, and innocent misrepresentation. As discussed above, all of these claims are arbitrable under the broad arbitration clause to which Telcor is bound. Additionally, Alamria has named Oncor as a defendant (with the individual defendant Haan) in counts V and VI which allege, respectively, that Oncor is liable (1) for aiding and abetting Telcor's breach of contract and Telcor's fraudulent misrepresentation,

and (2) for tortious interference with Telcor's alleged breach of thé Contract. If Alamria demonstrates at trial that Oncor is bound to the Alamria/Telcor Contract and the arbitration clause contained therein, Oncor will be required to arbitrate these additional claims. *See J.J. Ryan*, 863 F.2d at 319–20 (requiring arbitration of a tortious interference with contract claim because "the dispute over the termination of the contracts and exercise of the security agreements involved factual issues arising in connection with the contracts").